691 P.2d 1266

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Roger Eugene BARUTH,
Defendant-Appellant.**

No. 14213.

Court of Appeals of Idaho.

Nov. 21, 1984.

Petition for Review Denied
Jan. 30, 1985.

Michael J. Vrable, Coeur d'Alene, for defendant-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Jean R. Uranga, Myrna A.I. Stahman, Deputy Attys. Gen., Boise, for plaintiff-respondent.

SWANSTROM, Judge.

Roger Eugene Baruth was convicted of robbery, I.C. § 18–6501, and sentenced to the custody of the Board of Correction for a fixed term of thirty years. The district court enhanced the sentence with a consecutive three-year term, under I.C. § 19–2520, for use of a firearm during the commission of the robbery. Baruth appealed. We affirm in part and reverse in part.

Baruth raises five issues on appeal. First, he argues that the district court erred in refusing to suppress the revolver seized from the vehicle he was driving when arrested. Second, he contends that the court abused its discretion by allowing the state to cross-examine him concerning the contents of a lunch bucket found in the vehicle. Third, Baruth contends that prosecutorial misconduct in the state's closing arguments constituted reversible error. Fourth, he argues that the court erred by enhancing his sentence under I.C. § 19–2520 when there was "neither pleading nor proof of firearm use nor a special finding by the jury that a firearm was used." Finally, he contends that the court abused its sentencing discretion by imposing a thirty-year fixed term for robbery and a consecutive three-year term for use of a firearm.

The events leading to Baruth's conviction for robbery occurred on the night of February 7, 1981. They are highly disputed and we will relate Baruth's version first. He testified as follows. He had driven to Osburn, Idaho from Boise with two others— his avowed purpose: to gamble. Sometime after arriving at his destination, he met with Vernie L. Johnson in Johnson's apartment above an establishment called the Barrel. They spent the next approximately forty-five minutes shooting craps. Baruth, who had begun the game with about $500 in cash, won in excess of $1,000. He then decided to quit. This decision irritated Johnson who wanted to continue. Nevertheless, the game broke up and, after leaving Johnson's apartment, Baruth picked up the two others who had made the trip with him. They then began their return journey.

Johnson's story is quite different. At about 10 o'clock on the night of February 7, there was a knock on his door. When he opened it, he was greeted by a man with a gun. The man wore a stocking cap, pulled down low, and a tight-fitting jacket with the collar turned up. The gun was a .38 caliber revolver. Johnson was ordered to walk to the living room, turn his pockets wrong side out and lie on the floor. Johnson complied. He estimated that $800 was taken from his left front pocket and $2,000 from his right front pocket. Also taken were his wallet and a gold-colored money clip. Shortly after the intruder left, Johnson's son and daughter-in-law, who had

been visiting him, returned. Only then, and at their suggestion, did Johnson decide to call the police and report the robbery.

Johnson's son testified that earlier in the evening, while Johnson was at dinner, Baruth and another man came to the apartment. They were looking for the elder Johnson and, upon being informed he was not there, indicated they would come back later. When Johnson returned from his evening repast, an old car was parked in front of the Barrel—even though the Barrel was closed. Shortly afterwards, Johnson's son and daughter-in-law left to eat. The daughter-in-law's suspicion, however, was piqued by the sight of what appeared to be a man "slumped down" in the car. Johnson the younger went back to the apartment to tell his father about this new development. Then, as they drove away, the daughter-in-law memorized the license number of the mysterious car. At trial Baruth admitted it was the car he had been driving.

In reporting the robbery to the police, Johnson provided a description of the car as well as its license number. Armed with this information, it did not take the police long to find the suspect vehicle. They stopped it and ordered the occupants out and to the rear of the car. They also ordered the occupants to lie face down on the pavement. Approaching the car, one of the officers spied a revolver under the driver's seat. The revolver was seized and later identified by Johnson as the one used in the robbery. Officers further testified that Johnson's wallet was found on the ground near the driver's door and that his money clip fell out of Baruth's pocket. Baruth, on the other hand, suggested that both the wallet and the clip were planted by police. Finally, approximately $1,600 was found on Baruth.

I

The first issue we will discuss is whether the district court erred by refusing to suppress the revolver seized from Baruth's car. While we agree with the court that the revolver need not be suppressed, we do not agree that such a result is justified by the plain view doctrine relied upon by the district court. Instead, we hold that the warrantless search of the car was permissible under either *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), or *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

■ It is not clear from the facts whether Baruth was placed under arrest prior to the search. Baruth argues that he was. He contends that the exigency associated with an automobile—its mobility—is removed when the occupants are arrested and that a warrant must then be obtained prior to a search of the automobile. *Belton*, however, held to the contrary. Laying down a bright-line rule, the United States Supreme Court declared that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *New York v. Belton*, 453 U.S. at 460, 101 S.Ct. at 2864 (footnotes omitted).

■ In any event, Baruth was not "officially" placed under arrest until after the revolver was seized. However, even if he was not in custody at the critical moment, the police were still entitled to search the car. In *Carroll v. United States, supra,* the Supreme Court stated:

if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid.

267 U.S. 132, 149, 45 S.Ct. 280, 283. Probable cause to believe that the car contained contraband was established prior to the stop. As noted above, the car was parked outside the residence of Vernie Johnson prior to the alleged robbery and it was gone soon after the robbery. Johnson's daughter-in-law, whose suspicion had been aroused, memorized the license number of

that car. When the robbery was reported, a description of the car and its license number was given to the police. This information, in turn, gave the police probable cause to believe the car contained contraband they could seize: either stolen property (the money, wallet and money clip), *see State v. Griffin*, 84 N.J.Super. 508, 202 A.2d 856 (1964), or the revolver used in the robbery, *see People v. Green*, 45 Ill.App.3d 506, 4 Ill.Dec. 158, 359 N.E.2d 1110 (1977).

■ Baruth, however, maintains that *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), diluted *Carroll* by requiring not only probable cause, but also exigent circumstances. He then argues that there were no exigent circumstances in the present case because the occupants of the car were in custody. We disagree. Assuming the suspects were in custody, Belton provides the justification for the search. If they were not in custody, an exigent circumstance existed and *Carroll* applied. Moreover, in *Coolidge*, the Supreme Court discussed *Carroll* and its progeny, distinguishing them by pointing out that *Carroll* involved a stop on the highway, a factor which made it impractical to secure a warrant before the vehicle could be moved out of the locality or jurisdiction. *See also Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). On the other hand, *Coolidge* involved a car sitting in the driveway of a house belonging to a man the police suspected of murder. The man had been under suspicion for several days. The Supreme Court held that the police had had sufficient time to obtain a warrant and should have done so. "The opportunity for search was thus hardly 'fleeting.'" *Coolidge v. New Hampshire*, 403 U.S. at 460, 91 S.Ct. at 2035. In the present case, Baruth's car was stopped on the highway soon after the robbery, a situation similar to *Carroll*. The warrantless search was therefore valid and the revolver was properly seized. The district court did not err in refusing to suppress this evidence.

## II

The second issue we will discuss is whether the district court erred by allowing the state to cross-examine the defendant regarding the contents of a lunch bucket found in the car. The lunch bucket contained some rubber gloves, a rubber Halloween-type mask, a gun and a stocking cap. Baruth contends that cross-examination about these items went beyond the scope of the direct examination. Furthermore, he maintains, it was not proper rebuttal. The state insists, on the other hand, that it was a proper line of questioning for either cross-examination or rebuttal because it went to the defendant's claim, made on direct examination, that he went to Osburn only to gamble, not to rob. We hold that it was proper cross-examination and therefore do not reach the question of whether it was proper for rebuttal.

The scope of cross-examination is governed by I.R.C.P. 43(b)(3): "The opposite party may cross-examine the witness as to any facts stated in his examination or connected therewith, and in so doing may put leading questions." The purpose of cross-examination "is to weaken or show the untruthfulness of the testimony of the party examined or the party's bias or prejudice." *State v. Van Vlack*, 57 Idaho 316, 346–47, 65 P.2d 736, 750 (1937). In addition, where the defendant voluntarily takes the stand, he becomes,

> as any other witness, subject to cross-examination as to all matters of fact and circumstances leading up to and surrounding the commission of the [crime] and connected therewith or related thereto .... [H]e is subject to the same rules applicable to other witnesses and may be cross-examined in regard to all matters to which he has testified on his direct examination or connected therewith.

*State v. Hargraves*, 62 Idaho 8, 18, 107 P.2d 854, 858 (1940).

■ The state in the present case argues, and the district court held, that since Baruth claimed on direct examination he drove to Osburn to gamble, the state could ask him about items found in the car which indicated a different purpose—that he went

to Osburn to commit a robbery. We agree. The gloves, mask and gun all tend to weaken Baruth's testimony as to his purpose for going to Osburn. The allowance of such cross-examination was within the sound discretion of the district court. *See State v. Starry*, 96 Idaho 148, 525 P.2d 343 (1974).

■ On appeal Baruth also argues that it was error to allow the contents of the lunch box to be discussed or to be displayed to the jury since they were never introduced during the state's case in chief. The question regarding the contents of the lunch box arose when the prosecuting attorney asked Baruth about a .25 calibre shell found on the floor of the car by an officer. Baruth admitted that there was a second revolver, a .25 calibre gun in the lunch box when he was stopped. Baruth also described other items in the lunch box, which he said were all left in Baruth's car two days before by a hitchhiker. Baruth's attorney then asked for the items to be marked "if we are going to refer to certain items." The prosecutor requested the clerk to "[j]ust mark the whole thing." Our examination of the trial transcript convinces us that Baruth's only real objection at trial was that the state could have produced evidence about the contents of the lunch box only during its case in chief, if at all. We find the argument now made on appeal to be without merit in view of what Baruth had already testified to concerning the contents of the lunch box.

### III

The third issue we will discuss is whether statements made by the prosecutor during his closing arguments constituted misconduct and, if so, whether that misconduct amounted to prejudicial error. The statements may be grouped into two categories: (1) those to which *no* objections were made at trial, and (2) those to which objections were made. In the first category are the following statements:

> Not only the Defendant, Mr. Baruth, is on trial here but the entire criminal justice system is. Obviously you have the responsibility to protect innocent people from being wrongly convicted. But you also have the responsibility to realize that you are the only thing standing between the people of this community and Mr. Baruth robbing or doing anything else he chooses to anyone else in the community.

and,

> Now, I am not making any statement regarding gun control because I don't think that gun [sic] should necessarily be controlled, but you have to realize there is one purpose of a weapon like this and that's to maim or kill another individual. They are not very good for hunting and if you are not maiming or killing someone you are going to be out target practicing so you can get better at it.

■ The threshold question is whether Baruth can claim on appeal that these statements constituted misconduct even though he did not object to them at the time they were made. Generally, an appellate court will not consider errors made at trial absent a timely objection. The failure to timely object acts as a waiver of that error. *See State v. Sharp*, 101 Idaho 498, 616 P.2d 1034 (1980). However, where a prosecutor is "guilty of misconduct calculated to inflame the minds of the jurors and arouse prejudice or passion against the accused by statements in his argument of facts not proved by evidence," a defendant will not be deemed to have waived the error by his failure to register a timely objection. *State v. Spencer*, 74 Idaho 173, 183–84, 258 P.2d 1147, 1154 (1953).

■ We believe the rule in *Spencer* applies in this case. In making the first statement, the prosecutor argued the "fact" that Baruth was likely to commit further crimes against the community if the jury acquitted him. In making the second, he argued the "fact" that the only use for the type of revolver in this case is to maim and kill. There is no evidence, however, to support either of these "facts." A prediction of future criminal conduct is not a fact; neither is there a claim by the

state that anyone was maimed or killed. We view these as inflammatory statements calculated to influence a jury to determine guilt on factors outside the evidence. Therefore, Baruth will not be deemed to have waived his right to assert that these statements constituted prosecutorial misconduct.

We now turn to the question of whether these statements constituted misconduct. The first statement was clearly improper for the guilt phase of the trial. *See State v. Kelley*, 209 Kan. 699, 498 P.2d 87 (1972). The alleged propensity to commit crime in the future does not bear upon the guilt or innocence of the accused. Telling the jury that they must convict Baruth to keep him from committing further robberies in the community goes beyond the prosecutorial function. At best the statement also distorts the function of a jury in a criminal case. If the statement was intended to remind the jurors not only of their duty to acquit the innocent but also to convict those proven guilty, the statement widely missed the mark. In context the second statement was less objectionable, as it was woven into the prosecutor's argument that the money was taken against the will of the victim and by the use of force or violence. However, the prosecutor stated his opinion that the gun—admittedly owned by Baruth—was good only for one purpose, "to maim or kill another individual." Apparently in reference to Baruth's testimony that he had fired the gun the day before the robbery, the prosecutor implied Baruth had been "target practicing" to "get better at [maiming and killing]." This also inflammatory language that was hardly justified by the record. A thoughtful prosecutor would realize that a strong case presents no need for such remarks, that a conviction in a weak case should not be jeopardized by injecting error tainted hyperbole into the record. We hold that these statements constituted prosecutorial misconduct.

The second category of statements, those to which objections were made, also constituted prosecutorial mis-

conduct in our opinion. This category consists of the following statements:

Now doubt is a defense attorney's stock and trade. They are going to market it, package it, and huckster it to the first juror in the box until the last word is out of their mouth.

and,

We have been up-front with our entire case. [Defense counsel] may want me to apologize to you for taking up my time prosecuting armed robbery instead of people committing victimless crimes.

and,

I will leave you with this and it's about a lawyer that is from down in Memphis, Tennessee, and some of you have heard this before. The lawyer's name was Red Fearson (sic.). He was in that case representing a defendant who was charged with armed robbery and Red Fearson was trying to reach an agreement with the people's lawyer. So, he wrote the people's lawyer. The people's lawyer was called General. "Dear General: I would like to see if we could work out something in regard to Lean Drew Miller. He is basically a good boy and just got mixed up in an unfortunate change of events. He was in this grocery store and was buying a package of cigarettes. The gun fell out of his pocket on the counter. The clerk got nervous and put all the money in a sack and Lean Drew got nervous and took it. He shouldn't have done it but I don't think he intended to."

These statements had the effect—if not the intent—to disparage Baruth's attorney. All three statements unfairly cast the role of a defendant's counsel. A prosecutor has every legitimate right to point out weaknesses in a defendant's case, but this can be done in many ways without attacking the defendant's counsel. Again, we believe these statements were improper.

Our conclusion, however, that the prosecutor's statements constituted misconduct does not end our inquiry. Although the prosecutor acted improperly, Baruth is not necessarily entitled to a new

trial. Only if the misconduct amounted to prejudicial error would we be required to reverse. To determine whether the statements were harmless or prejudicial error, we must examine all of the statements in context. "Each improper remark taken by itself may not be sufficient to deny the defendant a fair trial, but their cumulative effect may be enough." Johnson and Southard, *Prosecutorial Misconduct In Closing Argument: Does Harmless Error Mean Never Having To Say "Reversed?"*, 49 Kan.B.A.J. 205, 221 (1980). In addition, we note that objections to the first two statements in the second category were sustained and the district court immediately issued corrective admonitions. In effect, the court told the jury to disregard the objectionable remarks. We believe the court dealt with the remarks appropriately and we have taken those corrective admonitions into account in determining the extent of the prejudice. *See State v. LaMere*, 103 Idaho 839, 655 P.2d 46 (1982).

The standard applied by the United States Supreme Court in constitutional error cases, *see Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), has apparently been adopted by our Supreme Court for cases of prosecutorial misconduct.

> [The Idaho Supreme] Court in *LePage*, [102 Idaho 387, 630 P.2d 674 (1981)] stated that the question to be posed where evidence has been improperly admitted is: "Is the appellate court convinced beyond a reasonable doubt that the same result would have been reached had the evidence been properly excluded?" ...
> Even though the prosecutor's comment is not considered "evidence" it can be analyzed under *LePage*.

*State v. LaMere*, 103 Idaho at 844, 655 P.2d at 51 (citations omitted).

Subsequent to *LaMere* there was some indication that the Idaho Supreme Court was reinstating a former standard for testing prosecutorial misconduct, that is, deciding whether such conduct "materially contributed" to the verdict of the jury. *See State v. Abel*, 104 Idaho 865, 664 P.2d 772

(1983). Nevertheless, in *State v. Hodges*, 105 Idaho 588, 671 P.2d 1051 (1983), the latest case addressing this subject, the court stated:

> It should be noted that the test for harmless error where there has been prosecutorial misconduct is the same as that enunciated in *LePage, supra*, for tainted evidence. *State v. LaMere, supra. State v. Griffiths*, 101 Idaho 163, 610 P.2d 522 (1980). In *Griffiths*, decided before *LePage*, the court held that to constitute reversible error "the misconduct must be shown to have materially contributed to the verdict of the jury." 101 Idaho at 167, 610 P.2d at 526. However, the "materially contributed" language was discredited in *LePage*. 102 Idaho at 396, 630 P.2d at 680.

105 Idaho at 593 n. 3, 671 P.2d at 1056 n. 3. In applying the "beyond a reasonable doubt" standard in *Hodges* the court said that where there is "overwhelming and conclusive" proof of the defendant's guilt an appellate court may conclude that, beyond a reasonable doubt, the result would not have been different absent the misconduct. *See also State v. LePage, supra.*

■ In the present case we believe that the record reveals overwhelming and conclusive proof of Baruth's guilt. First, the revolver found in Baruth's car was identified by Johnson as the weapon used in the robbery, even though Baruth claimed that the gun was not on his person during his "meeting" with Johnson. This gives credence to Johnson's story that he had seen the revolver before he was asked by police to identify it. Second, Johnson's money clip and wallet were found at the scene of the arrest. In his testimony, Baruth insinuated that both items were planted by the officers. The record reveals, however, that none of the officers who participated in Baruth's arrest had been in contact with Johnson prior to their stopping Baruth on the highway. Thus, considering the overwhelming weight of the evidence and the corrective admonitions given by the district court, we find the misconduct in this case

to be harmless error which did not deprive Baruth of a fair trial.

## IV

The next issue we will discuss concerns the enhancement, under I.C. § 19–2520, of Baruth's sentence for robbery by a consecutive three-year sentence for use of a firearm in the commission of that robbery. Baruth argued that the statute should not have been applied to him because the state had not separately alleged the use of a firearm in its information nor had the jury specifically found that Baruth had used a firearm. The district court rejected Baruth's argument and he now brings it before us. We agree with the defendant and accordingly vacate the sentence enhancement for use of a firearm.

Idaho Code § 19–2520, at the time of this case, provided:

> Any person convicted of a violation of [section] . . . 18–6501 (robbery defined), Idaho Code, who carried, displayed, used, threatened, or attempted to use a firearm while committing the crime, shall, in addition to the sentence imposed for the commission of the crime, be imprisoned in the state prison for not less than three (3) nor more than fifteen (15) years. Such additional sentence shall run consecutively to any other sentence imposed for the above cited crimes.

This statute was amended in 1983 to require both a separate allegation and a special finding by the trier of fact that the defendant used a firearm. The statement of legislative purpose for the 1983 amendment indicated that the Legislature did not intend to *change* the requirements of the statute, but was simply furnishing *clarification* of those requirements. The statement of purpose provided in part: "This bill *would make it clear* that facts supporting imposition of the enhanced penalty must be separately charged in the accusatory pleadings and either admitted by the defendant or found to be true by the judge or jury at the trial for the underlying crime." (Emphasis added.)

The question we now face is whether these requirements should be applied to cases tried under the prior statute, giving due consideration to the Legislature's stated position that those requirements existed from the beginning. We hold that, to the extent fair notice was given by the prior statute, the requirements should be applied. We will not, in other words, require the public, or indeed the state, to be mind readers. Thus, the requirements existing, but unstated, are not binding except to the extent the prior statute can be fairly read as including those requirements.

The first requirement, that the information separately allege use of a firearm, is not at all evident from the face of the prior statute. Nevertheless, the courts have recognized that a defendant must be given fair notice of the state's intent to seek a sentence enhancement under I.C. § 19–2520. We also have previously held, under the prior statute, that an information containing two counts which set forth the essential facts of the crimes, including the defendant's use of a firearm in the commission of those crimes, is sufficient to invoke I.C. § 19–2520. *State v. Galaviz*, 104 Idaho 328, 658 P.2d 999 (Ct.App.1983). "Because the statute does not create a substantive offense, it was not necessary for the information to refer specifically to the statute." *Id.* at 332, 658 P.2d at 1003. We now hold it was not necessary under the prior statute to allege, in a *separate* count in the information, that the defendant used a firearm. In the present case, the information specifically, although not separately, alleged that Baruth used a firearm in the commission of the robbery. This gave the defendant sufficient notice and thus complied with the requirements of the prior statute.

The next question is whether the requirement that the trier of fact must find the defendant used a firearm applies to the prior statute and, if so, to what

degree. The whole tenor of that statute quoted above, implies that the use of a firearm is a question of fact for the trier of fact. The jury here returned a general verdict of guilty of the crime of robbery. Although the information alleged Baruth used a firearm, the basic elements of robbery do not include the use of a firearm. Furthermore, the verdict of the jury does not necessarily encompass all the facts alleged in the information, but only those essential to the crime charged. Therefore, absent a specific finding by the jury, we cannot say that it found beyond a reasonable doubt, as it must, that Baruth used a firearm in the commission of the robbery. *Cf. State v. Tosatto*, 107 Ariz. 231, 485 P.2d 556 (1971) (under Arizona statute, the jury need not make a finding that a firearm was used in the commission of the crime if the evidence presented clearly indicates the crime was committed by means of a firearm). The three-year sentence enhancement for use of a firearm must therefore be vacated.

V

■ Finally, Baruth appeals from the fixed thirty-year sentence imposed upon his conviction for robbery. He argues that the district court abused its sentencing discretion in imposing such a sentence. We do not agree. Baruth's prior record includes numerous felonies for robbery and burglary, delineating a clear pattern of criminal behavior since at least 1954. Having reviewed the full record and having considered the sentence review criteria set forth in *State v. Toohill*, 103 Idaho 565, 650 P.2d 707 (Ct.App.1982), we conclude that the district court did not abuse its discretion. The thirty-year fixed sentence for robbery is affirmed.

WALTERS, C.J., concurs.

BURNETT, J., concurring in parts I, II, III and V, dissenting without opinion as to part IV.