IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 39881

| STATE OF IDAHO, | ) | 2013 Opinion No. 58 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: November 8, 2013 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| LLOYD HARDIN McNEIL, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Deborah A. Bail, District Judge.

Judgment of conviction for voluntary manslaughter, first degree arson, and grand theft, affirmed.

Sara B. Thomas, State Appellate Public Defender; Spencer J. Hahn, Deputy Appellate Public Defender, Boise, for appellant. Spencer J. Hahn argued.

Hon. Lawrence G. Wasden, Attorney General; Russell J. Spencer, Deputy Attorney General, Boise, for respondent. Russell J. Spencer argued.

_____

SCHWARTZMAN, Judge Pro Tem

Lloyd Hardin McNeil appeals from the judgment of conviction and sentence entered upon jury verdicts finding him guilty of voluntary manslaughter, Idaho Code § 18-4006(1); first degree arson, I.C. § 18-802; and grand theft, I.C. §§ 18-2403(1), 18-2407(1)(b). We affirm.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 5, 2011, firefighters responded to a residential fire in a Boise neighborhood. The firefighters determined that the fire was confined to a mattress and box spring located in a bedroom. After removing the mattress from the house, firefighters found the body of Natalie Davis lying on top of the box spring. Following an investigation, firefighters concluded that the fire was intentional and human caused. This conclusion was supported by subsequent reconstructed tests of the scenario.

1

Pursuant to an investigation, police officers discovered that Davis' car was missing, along with her two dogs. Later, the dogs were located in a "no kill" shelter in Dillon, Montana and McNeil was identified as the individual who dropped the dogs off. Thereafter, McNeil was located in Seattle, Washington and arrested on a fugitive warrant.

McNeil was charged with second degree murder, first degree arson, and grand theft. Following a jury trial, he was acquitted of second degree murder and convicted of the lesser-included offense of voluntary manslaughter. He was also convicted of first degree arson and grand theft. The district court imposed consecutive terms of fifteen years determinate for the voluntary manslaughter conviction, twenty-five years indeterminate with ten years determinate for the first degree arson conviction, and fourteen years indeterminate for the grand theft conviction, resulting in a unified sentence of fifty-four years with twenty-five years determinate. McNeil filed an Idaho Criminal Rule 35 motion for reconsideration of his sentence, which the district court denied.

## II.

## ANALYSIS

McNeil claims that: (1) the evidence was insufficient to support a conviction for voluntary manslaughter; (2) his constitutional rights were violated when the State committed unobjected-to misconduct in its closing argument; (3) the district court abused its discretion when it imposed an excessive sentence; and (4) the district court abused its discretion when it denied his Rule 35 motion.

### A. Sufficiency of Evidence

McNeil contends that the evidence was insufficient to support a conviction of voluntary manslaughter.[1] Appellate review of the sufficiency of the evidence is limited in scope. A finding of guilt will not be overturned on appeal where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt. *State v. Herrera-Brito*, 131 Idaho 383, 385, 957 P.2d 1099, 1101 (Ct. App. 1998); *State v. Knutson*, 121 Idaho 101, 104, 822 P.2d

---

[1] The indictment, charging McNeil with second degree murder, stated that McNeil "did willfully, unlawfully, deliberately, and with malice aforethought, but without premeditation, kill and murder, Natalie Claire Davis, a human being, by suffocation by unknown means from which she died."

998, 1001 (Ct. App. 1991). We will not substitute our view for that of the trier of fact as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001; *State v. Decker*, 108 Idaho 683, 684, 701 P.2d 303, 304 (Ct. App. 1985). Moreover, we will consider the evidence in the light most favorable to the prosecution. *Herrera-Brito*, 131 Idaho at 385, 957 P.2d at 1101; *Knutson*, 121 Idaho at 104, 822 P.2d at 1001.

In the instant case, McNeil was convicted of voluntary manslaughter, which is defined as "the unlawful killing of a human being . . . without malice" and "upon a sudden quarrel or heat of passion." I.C. § 18-4006(1). McNeil argues that the State failed to present substantial and competent evidence with respect to two elements: (1) that McNeil committed a criminal act that caused Davis' death; and (2) that the death resulted from a sudden quarrel or heat of passion.

At trial, evidence was admitted that depicted the stormy relationship between McNeil and Davis. A Montana detective testified that, approximately eight months prior to her death, Davis went to the Bozeman police station and reported that McNeil struck her with a flashlight, grabbed her, and was verbally abusive. As a result, the State of Montana charged McNeil with felony assault with a weapon and misdemeanor partner or family member assault. McNeil was released on bail and, as a condition of his bail, was ordered to have no contact with Davis. Davis met several times with a victim coordinator, and the coordinator stated that, although Davis did not want anything bad to happen to McNeil, she was willing to testify in the case against him. While the case was pending, Davis moved to Boise and McNeil remained in Montana. Approximately one month prior to Davis' death, McNeil boarded a bus to Boise, where he met a Ms. Pluard. He told Pluard about his "tumultuous" and "difficult" relationship with Davis, including that he was being charged with a crime and that he had a no contact order. He also told her that he was concerned about seeing Davis due to the no contact order, but that he thought there would be repercussions with his pending criminal charges if he did not see her. After arriving in Boise, McNeil and Pluard kept in contact by email and telephone. Two weeks prior to Davis' death, McNeil told Pluard that he would be returning to Montana soon, that he was in possession of an antique ring "appraised high," that his "plan worked," and that he thought Davis would "be in jail soon."

Davis' brother testified that he lived with Davis and slept in a bedroom in the basement of the house. On the day of her death, he was awakened at 6:30 a.m. by the sound of McNeil and

3

Davis arguing. He then heard "some loud noises, banging, like the sound of stomping feet, or maybe somebody slamming a door repeatedly." The brother noted that the loud noises were "like bang, bang, and then bang, bang." Following the noises, the arguing stopped. Minutes later, the brother's alarm went off and he went upstairs to use the bathroom. He then saw McNeil sitting on a futon and Davis lying on the futon. He further testified that McNeil told him Davis was "sleeping." Later, when the brother left the house for work, he stated that he saw McNeil and Davis "lying down next to each other on the futon," but did not speak to either person.

The pathologist testified that during the autopsy of Davis he discovered several fresh bruises covering the body, specifically a large bruise on the chest along with bruises on the arms, legs and neck. Additionally, he noted that Davis had a blood alcohol level of .141 and had an elevated level of Benadryl in her system, but the amounts of alcohol and Benadryl were not lethal, although sufficient to somewhat sedate Davis.

The pathologist stated that he attempted to establish a cause of death. He testified that possible causes of death include intentional, accidental, and natural deaths. He found that Davis did not die of natural causes; therefore, the cause of Davis' death was either intentional or accidental. However, the pathologist was unable to conclusively determine whether the death was intentional or accidental based on the results of the autopsy. Nevertheless, he did provide explanations for possible scenarios in which intentional or accidental death could have been implicated. As to intentional death scenarios, he stated that a person could have killed Davis by placing a hand, pillow or another object over her mouth while she was in her sedated state causing her to suffocate. A person could have also killed Davis by compressing her chest, for example, by sitting on her chest while so sedated. Such manner of death would be intentional and would be supported by the autopsy results. As to accidental death, the pathologist related that Davis could have suffocated by lying on the floor with her neck against the wall compromising her airway. This type of accidental death would also be supported by the autopsy. Therefore, the pathologist was unable to conclusively determine whether the death was intentional or accidental based solely on the autopsy results. However, he did testify that he suspected the death was not accidental based on the body being placed between a mattress and box spring and a cigarette butt being placed in the mouth. The autopsy revealed that Davis was deceased prior to the fire being started.

4

Following the presentation of evidence, the district court provided the jury with instructions, including ones for second degree murder, voluntary manslaughter, and involuntary manslaughter. Neither party objected to the court's instruction on voluntary manslaughter.

### 1. Cause of death

McNeil contends that the evidence presented at trial was not sufficient to establish that he caused Davis' death. He argues that the pathologist's inability to determine whether Davis' death was accidental or intentional demonstrates that his voluntary manslaughter conviction is not supported by substantial and competent evidence. The State asserts that the evidence clearly shows that Davis' death was not from natural causes and that she died prior to the fire. The State also points to the circumstances surrounding the death--placing the body between a mattress and a box spring and lighting the mattress on fire, stealing Davis' car and belongings, and then fleeing out of state--to further infer that the death was not accidental.

The Idaho Supreme Court decided a similar issue in *State v. Severson*, 147 Idaho 694, 215 P.3d 414 (2008). In that case, Severson was charged with murdering his wife. The medical examiner who performed the autopsy testified that the wife died by suffocation, drug overdose, or both. The wife's body contained bruises and abrasions on her face and cuts on the inside of her lip consistent with suffocation. Additionally, the autopsy revealed that the wife had lethal levels of Unisom and toxic levels of Ambien in her system. The cause of death was ultimately listed as "undetermined," because the evidence supported both possible causes of death. Although the exact cause of death could not be identified, evidence produced at trial revealed that it was unlikely that the wife's overdose was self-imposed, as her treating physician testified that she did not have suicidal ideations. Moreover, substantial evidence linked Severson to his wife's death. On appeal, the Supreme Court determined that sufficient evidence supported the verdict, stating:

> In sum, although the State's case against Severson was circumstantial, there was substantial and competent evidence to support the jury's conclusion that Severson was guilty of first-degree murder. Severson was the only person besides [the wife] in the couple's home that night. He had access to [the wife's] sleeping pills and the means to suffocate her. He "discovered" her lying on the couch not breathing, but did not call 911. He had a motive to kill [the wife], had recently tried to poison her, and tried to conceal facts relevant to the cause of her death. While some of the evidence presented may have been susceptible to reasonable inferences of both guilt and innocence, deciding what inferences to draw was up to the jury. *See State v. Ojeda*, 119 Idaho 862, 865, 810 P.2d 1148, 1151 (Ct.

App. 1991).    For these reasons, the jury could have concluded beyond a reasonable doubt that Severson murdered his wife by suffocating her, overdosing her, or both.

*Severson*, 147 Idaho at 715, 215 P.3d at 435.

McNeil claims that *Severson* is distinguishable from the instant case because here the pathologist could not determine whether Davis' death was accidental or due to the intentional act of another person.  We disagree.  The medical examiner in *Severson* testified that the wife's death resulted from overdose, suffocation, or both.  A drug overdose can be either intentional or accidental.  However, the Supreme Court stated that "[t]he evidence produced at trial revealed that it was unlikely that [the wife's] overdose was self-imposed, but there was substantial evidence linking Severson to her murder."  *Id.* at 714, 215 P.3d at 434.  In other words, the evidence demonstrated that it was unlikely that the wife's death was accidental, but rather intentional.

Similarly, the evidence produced at trial revealed it was unlikely that Davis' death was accidental and demonstrated that McNeil was closely linked to her death.  McNeil and Davis had a history of violence and domestic disputes; indeed, McNeil had pending domestic violence charges in Montana as a result of physically and verbally abusing Davis.  Evidence also revealed that McNeil went to Boise in violation of a court order, in the hopes that his presence would result in Davis' favorable testimony at his trial.  Thereafter, McNeil engaged in several more arguments with Davis prior to her death and he formed a plan to return to Montana with Davis' vehicle and antique ring.

Testimony also established that McNeil and Davis engaged in an argument the morning of her death, wherein loud noises, "like bang bang, and then bang, bang," were heard, following which the argument subsided.  Further, when the brother left for work, McNeil was alone in the house with Davis while she allegedly slept.  At some point Davis died, and instead of calling 911, McNeil staged a scene to make it appear that her death was caused by a house fire ignited by her act of smoking a cigarette in bed.  Specifically, her body was placed in between the mattress and box spring, a cold cigarette butt was placed in her mouth, and electrical items were placed around the bed.  Thereafter, McNeil removed Davis' two dogs and stole her vehicle, which was packed with her personal belongings.  McNeil then fled Idaho and drove to Montana

6

where he dropped the dogs at a kennel and convinced Pluard to pawn Davis' antique ring. Subsequently, McNeil purchased a bus ticket to Seattle where he was later arrested.

We conclude, as the Court did in *Severson*, 147 Idaho at 713-14, 215 P.3d at 433-34, that substantial and competent evidence supports the jury's conclusion that McNeil caused Davis' death. McNeil had the opportunity to kill her while she was in a vulnerable and helpless state. McNeil and Davis had a lengthy history of violence and they actually engaged in a physical and verbal altercation that very morning. McNeil thereafter went to great lengths to conceal the circumstances surrounding her death rather than calling 911 or reporting the death to authorities. As discussed in *Severson*, although the evidence presented may have been susceptible to reasonable inferences of both guilt and innocence, the jury had the ability to decide what inferences to draw. Accordingly, the jury could have concluded, beyond a reasonable doubt, that McNeil caused Davis' death by suffocating her or by compressing her chest during or after the argument and then staged a fire to conceal the relevant circumstances of her death.

### 2. Sudden quarrel or heat of passion

McNeil further claims that no evidence was presented to support the conclusion that Davis' death was the result of a sudden quarrel or heat of passion. Specifically, he argues that evidence suggested that Davis ingested quantities of alcohol and Benadryl such that a normal person would have been "very difficult to arouse," and that "[i]t is difficult to imagine how a person who is passed out cold could possibly have participated in a 'sudden quarrel' let alone aroused the 'heat of passion' in another person." Accordingly, McNeil contends that the absence of such evidence precludes a conviction for voluntary manslaughter.

The State claims that the jury could have concluded that Davis died during her argument with McNeil, thus constituting a killing upon a sudden quarrel or heat of passion. As discussed above, the brother testified at trial that he heard McNeil and Davis arguing in the early morning. He then heard loud "banging" noises and the arguing subsided. When the brother went upstairs, McNeil told him that Davis was sleeping. The brother never spoke with Davis or verified that she was asleep. Davis never moved from the futon from the time the brother initially went upstairs to the time he left the residence for work. In short, the brother was unable to verify that Davis was still alive when he left the house for work in the morning.

Based on the record, there is evidence that Davis could have died during her fight with McNeil. Further, there is sufficient evidence to support a finding that "heat of passion" existed

7

during the fight, as shown by the physical and verbal nature of the argument and fresh bruises on her body. Additionally, heat of passion continued to exist after Davis' death as demonstrated by McNeil's actions of staging a fire, burning her body, stealing her possessions, and fleeing the state. Accordingly, we conclude that sufficient evidence supports McNeil's conviction for the lesser-included offense of voluntary manslaughter.

**B.     Misconduct**

McNeil next claims that the State committed misconduct by making indirect statements about his decision to remain silent and by making inflammatory comments designed to appeal to the passions of the jury. While our system of criminal justice is adversarial in nature, and the prosecutor is expected to be diligent and leave no stone unturned, he or she is nevertheless expected and required to be fair. *State v. Field*, 144 Idaho 559, 571, 165 P.3d 273, 285 (2007). However, in reviewing allegations of prosecutorial misconduct we must keep in mind the realities of trial. A fair trial is not necessarily a perfect trial. *Id.*

The statements that McNeil alleges constitute prosecutorial misconduct occurred during the State's closing and rebuttal argument. Closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. *State v. Phillips*, 144 Idaho 82, 86, 156 P.3d 583, 587 (Ct. App. 2007). Its purpose is to enlighten the jury and to help the jurors remember and interpret the evidence. *Id.*; *State v. Reynolds*, 120 Idaho 445, 450, 816 P.2d 1002, 1007 (Ct. App. 1991). Both sides have traditionally been afforded considerable latitude in closing argument to the jury and are entitled to discuss fully, from their respective standpoints, the evidence and the inferences to be drawn therefrom. *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003); *Phillips*, 144 Idaho at 86, 156 P.3d at 587.

Appeals to emotion, passion, or prejudice of the jury through the use of inflammatory tactics are impermissible. *Phillips*, 144 Idaho at 87, 156 P.3d at 588. *See also State v. Raudebaugh*, 124 Idaho 758, 769, 864 P.2d 596, 607 (1993); *State v. Pecor*, 132 Idaho 359, 367, 972 P.2d 737, 745 (Ct. App. 1998). The prosecutor's closing argument should not include disparaging comments about opposing counsel. *Phillips*, 144 Idaho at 86, 156 P.3d at 587. *See also Sheahan*, 139 Idaho at 280, 77 P.3d at 969; *State v. Brown*, 131 Idaho 61, 69, 951 P.2d 1288, 1296 (Ct. App. 1998); *State v. Baruth*, 107 Idaho 651, 657, 691 P.2d 1266, 1272 (Ct. App. 1984).

McNeil made no contemporaneous objection to the prosecutor's statements at trial. In *State v. Perry*, 150 Idaho 209, 245 P.3d 961 (2010), the Idaho Supreme Court clarified the fundamental error doctrine as it applies to allegations of prosecutorial misconduct. If the alleged misconduct was not followed by a contemporaneous objection, an appellate court shall vacate and remand when a defendant persuades the court that the alleged error: (1) violates one or more of the defendant's unwaived constitutional rights; (2) is clear or obvious without the need for reference to any additional information not contained in the appellate record; and (3) affected the outcome of the trial proceedings. *Id.* at 226-28, 245 P.3d at 978-80.

### 1. Statements implicating McNeil's decision to remain silent

McNeil alleges that the prosecutor made two statements during his closing argument regarding McNeil's decision to remain silent. In the first the prosecutor said, "He puts that body between the mattress and the box springs. We know that's a staged scene. You know that's a staged scene. *There has been no testimony other than that.*" (Emphasis added.) In the second the prosecutor stated:

> And, of course, we know she was dead before the fire, so the fire didn't kill her, and she had been dead some time before the fire because the lividity had set in, so there is a small window there nobody can really know except the defendant.
> *He's the only one who lived through it.* But, you know, there was an expression of malice in there. It's on both sides of the act, and it's a small little narrow band in the act; why would you think that he went from malice to no malice while he was killing her, and then expressing residual malice after-the-fact? Of course, this is a malicious killing.

(Emphasis added.) McNeil argues that these statements were indirect references to his failure to testify and were constitutionally impermissible.

The Fifth Amendment guarantees "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. In *Griffin v. California*, 380 U.S. 609 (1965), the United States Supreme Court held that the Fifth Amendment, as applied to the states by reason of the Fourteenth Amendment, forbids the prosecutor and the trial court from commenting to the jury on a defendant's failure to testify at trial. *Id.* at 615. This rule applies to direct and indirect comments on the defendant's failure to testify. *State v. McMurray*, 143 Idaho 312, 314, 143 P.3d 400, 402 (Ct. App. 2006). In *McMurray*, this Court stated:

> In [*State v. Hodges*, 105 Idaho 588, 671 P.2d 1051 (1983)], Idaho's highest court noted that the rule proscribing comment on a defendant's failure to

testify "does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses." [Hodges, 105 Idaho at 592, 671 P.2d at 1055]. Where the state's expert testified that the substance possessed by Hodges was cocaine and the prosecutor remarked that such evidence was uncontradicted, there simply was no implication that Hodges was *obligated* to take the witness stand in order to avoid an inference of guilt. *Id.* at 591-92, 671 P.2d at 1054-55. In this vein, Idaho follows the overwhelming number of jurisdictions holding that a prosecutor's general references to uncontradicted evidence do not necessarily reflect on the defendant's failure to testify, where *witnesses other than the defendant* could have contradicted the evidence. *See, e.g.*, *Lincoln v. Sunn*, 807 F.2d 805, 810 (9th Cir.1987); *Raper v. Mintzes*, 706 F.2d 161, 164 (6th Cir.1983). Even so, prosecutorial comments on the lack of contradicting defense evidence may *necessarily* result in an indirect *Griffin* violation depending on the number and nature of those comments. *See id.* Courts uniformly condemn this prosecutorial tactic due to the difficulty of determining whether *Griffin* violations are constitutionally harmless. *See, e.g.*, *United States v. Castillo*, 866 F.2d 1071, 1084 (9th Cir.1989).

*McMurray*, 143 Idaho at 314-15, 143 P.3d at 402-03.

As to the prosecutor's first statement, we determine that it is akin to the statement in *Hodges* in that there is no implication that McNeil was obligated to take the witness stand in order to avoid an inference of guilt. The prosecutor's comment referred to uncontradicted evidence that the fire was staged. Defense counsel had the opportunity to call witnesses other than the defendant, such as an expert witness in fire investigation, to contradict evidence regarding how the fire started. Accordingly, we conclude this statement did not amount to a violation of McNeil's constitutional rights.

As to the second statement, even if it tangentially implicates a constitutional violation, without so holding, we determine that any such error is harmless. The prosecutor's statement occurred during a discussion of the malice element for second degree murder. The prosecutor essentially said that McNeil acted with malice before Davis' death as demonstrated by their argument in the morning, and McNeil acted with malice after Davis' death as demonstrated by his theft of Davis' belongings and vehicle. The prosecutor then argued that, though McNeil was the only person present, McNeil must have had malice during the event that caused Davis' death because it would be unreasonable to have malice, then have a brief period of no malice, and then have the malice resume again. However, the jury rejected this argument and determined, by virtue of its verdict, that McNeil acted without malice and accordingly acquitted him of second

10

degree murder. Therefore, we conclude that the statement by the prosecutor was, at most, harmless error as the jury failed to accept the prosecutor's malice argument, which the statement intended to deduce.[2]

### 2. Statements designed to inflame the jury

McNeil claims that his constitutional rights to due process and a fair trial were violated when the prosecutor used comments designed to inflame the jury. McNeil points to five statements made by the prosecutor to demonstrate this misconduct. First, the prosecutor said, "She was a helpless victim, helpless adult, *like a baby*. She drank too much, probably, had too many sleeping pills, was trying to get to Monday to get out of town. But she was in no condition to fight back, so it made it easy for the defendant." (Emphasis added.) Second, the prosecutor argued in rebuttal, "I guess they concede the grand theft." Third, the prosecutor stated in rebuttal, "We want to hold people accountable when they murder someone, yes, but we don't want it to happen. We don't want to make it up. A*nd he has to say that to try to get his client out of trouble.*" (Emphasis added.) Fourth, the prosecutor said, "And that just because she was vulnerable and an easy target, it's no reason to let him get away with murder." Fifth, the prosecutor stated:

> Mark Twain once commented that every person is born to one possession that out-values all the rest at his last breath, and that's what the defendant stole from [Davis] in this case. He stole her last breath, her most valuable possession. What do we know about some of the last breaths she had? Some were spent telling him to get out. Some were spent calling the police on him. Fibbing, but calling. Some were spent calling Montana authorities. And defendant couldn't have that. That's no way of spending your last breath.

The State argues that, in context, the statements were proper rebuttal to defense counsel's arguments and proper arguments of the evidence. After reviewing the record, we find McNeil's position to be without merit. The prosecutor's statements were made in direct rebuttal to defense counsel's argument and were otherwise comments regarding admissible evidence. Further, McNeil failed to object at trial to the alleged misconduct. Based on the record, we cannot conclude that the prosecutor's statements amounted to misconduct, much less rising to the level

---

[2] The State argues that the statement was a comment on the evidence relating to McNeil's opportunity to kill Davis, and therefore, it is not clear from the record that the prosecutor was commenting on McNeil's failure to take the stand.

11

of fundamental error. *See and compare* with arguments and rulings made in *Severson*, 147 Idaho at 718-21, 215 P.3d at 438-41.

**C.    Excessive Sentence**

McNeil contends that, in light of the mitigating factors present in his case--including McNeil's young age, his lack of prior felony convictions, and the fact that all three crimes arose out of the same incident--the district court abused its discretion by imposing an excessive sentence. An appellate review of a sentence is based on an abuse of discretion standard. *State v. Burdett*, 134 Idaho 271, 276, 1 P.3d 299, 304 (Ct. App. 2000). Where a sentence is not illegal, the appellant has the burden to show that it is unreasonable, and thus a clear abuse of discretion. *State v. Brown*, 121 Idaho 385, 393, 825 P.2d 482, 490 (1992). A sentence may represent such an abuse of discretion if it is shown to be unreasonable upon the facts of the case. *State v. Nice*, 103 Idaho 89, 90, 645 P.2d 323, 324 (1982). A sentence of confinement is reasonable if it appears at the time of sentencing that confinement is necessary "to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case." *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982). Where an appellant contends that the sentencing court imposed an excessively harsh sentence, we conduct an independent review of the record, having regard for the nature of the offense, the character of the offender, and the protection of the public interest. *State v. Reinke*, 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct. App. 1982). When reviewing the length of a sentence, we consider the defendant's entire sentence. *State v. Oliver*, 144 Idaho 722, 726, 170 P.3d 387, 391 (2007).

We begin our analysis by focusing on McNeil's age and the length of the determinate portion of the sentences imposed for the crimes committed by him. As always, we consider the entire sentence, but we presume that the determinate portion of the sentence will be the defendant's probable term of confinement. *Id*. McNeil was thirty-one years old at the time of the offense. He will be eligible for parole at age fifty-six, after serving twenty-five years determinate for the voluntary manslaughter and arson convictions. If he is not paroled, he will be released at the age of eighty-five.

In addition to his young age, McNeil also asserts that his sentence is excessive in light of his record and his strong familial support. The record demonstrates that McNeil had no prior

12

felony convictions. However, at the time of Davis' death, McNeil was facing domestic violence charges and Davis had a no contact order against McNeil.

The district court, in imposing McNeil's sentence, considered the sentencing objectives, the nature of the crimes, the seriousness of the offenses, McNeil's rehabilitation potential, and McNeil's lack of remorse or acknowledgement of wrongdoing. The court noted that McNeil was convicted of a homicide and pointed out the great lengths McNeil went to in order to conceal his crime. The court also considered the disregard McNeil showed other individuals in his attempt to conceal the crime, including placing firefighters and neighbors at risk as a result of setting the house on fire. Additionally, the court acknowledged McNeil's lack of felony convictions, but also recognized that he had a pending domestic violence charge at the time of the crime, and that he went to Davis' house, in violation of a no contact order, to convince her to drop the charges. Based on the foregoing, we cannot conclude that the district court abused its discretion in imposing McNeil's sentence.

## D.     Rule 35 Motion

McNeil claims that, in light of new information regarding his rehabilitative potential, the district court abused its discretion when it denied his Rule 35 motion. A motion for reduction of sentence under I.C.R. 35 is essentially a plea for leniency, addressed to the sound discretion of the court. *State v. Knighton*, 143 Idaho 318, 319, 144 P.3d 23, 24 (2006); *State v. Gill*, 150 Idaho 183, 186, 244 P.3d 1269, 1272 (Ct. App. 2010). In presenting a Rule 35 motion, the defendant must show that the sentence is excessive in light of new or additional information subsequently provided to the district court in support of the motion. *State v. Huffman*, 144 Idaho 201, 203, 159 P.3d 838, 840 (2007). In conducting our review of the grant or denial of a Rule 35 motion, we consider the entire record and apply the same criteria used for determining the reasonableness of the original sentence. *State v. Forde*, 113 Idaho 21, 22, 740 P.2d 63, 64 (Ct. App. 1987); *State v. Lopez*, 106 Idaho 447, 449-51, 680 P.2d 869, 871-73 (Ct. App. 1984).

McNeil provided the district court with information that he had completed ninety-six classes in sixty days while at the Idaho State Correctional Institute. This equated to 162 hours of treatment that he voluntarily attended. McNeil argues that this new information demonstrates his rehabilitative potential and that the district court abused its discretion by denying his Rule 35 motion in light of this information and the mitigating factors discussed above. The State contends that the new information, though positive, does not reduce the risk that McNeil poses to

society and does not ameliorate the seriousness of the crime.  We agree.  McNeil's attendance in courses, while commendable, does not establish that his sentences were excessive.  As discussed above, the district court properly considered several factors in imposing McNeil's sentence, including the nature and seriousness of the crime and the threat to public safety.  McNeil's new information does not address the public safety concerns underlying his sentences or reduce the risk he poses to society.  Further, the new information does nothing to depreciate the seriousness of the crime.  Therefore, the district court did not abuse its discretion in denying McNeil's Rule 35 motion.

## III.

## CONCLUSION

Sufficient evidence supports McNeil's conviction for voluntary manslaughter.  Also, McNeil has failed to demonstrate reversible error in regard to his claim of prosecutorial misconduct and he has failed to demonstrate that the district court erred in imposing his sentence.  Accordingly, McNeil's judgment of conviction is affirmed.

Chief Judge GUTIERREZ and Judge MELANSON **CONCUR.**